Birchard, Judge.
The papers in this case are voluminous, and contain much matter that may be passed over in stating the principle upon which the decision of the case must turn. The main facts are these : Townships 8 and 9, in the 14th range, were appropriated by *109 Congress and set apart for the purpose of endowing an University. In 1799, the territorial Legislature, by a resolution, requested Rufus Putnam and others to lay off in one of the townships a town plat, to contain a square for the colleges, lots suitable for house lots, and gardens for a President, Professors, Tutors, etc., bordering on, or encircled by, spacious commons, and such a number of town lots adjoining said commons and outlots, as they should think will be for the advantage of the University.
In 1803, an act confirming and establishing the town of Athens, in the county of Washington, provides that the return and report of sgid Putnam, etc., be accepted and approved, and that the said town be confirmed and established ; “ provided, that the trustees of the University therein to be established,, shall have power to alter the plan of said town, by extending the house lots into the commons or outlots which adjoin the town, or by altering the streets,” etc..; “ provided, also, that such alterations be made, and a plat of the town, outlots and commons, with a designation of the uses of the commons, be recorded,” prior to a lease, etc.
The second section designates lots 55 and 56 to be set apart for the use of the town and county, to be noted on the plat, and the title to vest in the county for the uses designated thereby.
*An act bearing date February 21, 1805, established the Uni- [109 versity, and appointed certain persons trustees. The 13th section made it the duty of the “ trustees to lay off the town of Athens, conformably to the plan of Rufus Putnam and others, in pursuance of resolutions of 1799, with such variations, however, as they may find it expedient to make; and the same being thus laid off, and a plat of the same, with a designation of the uses of the several parts of being recorded,” etc.; and upon certain terms to sell.
A plat of the town was made, on which is a certificate of the recorder, that it was recorded on the 4th October, 1804. This plat contains certain streets, squares, etc., pertinently designated, and also certain vacant or unsurveyed land, without the limits of the town proper, bearing this designation : “ All the lands within the aforesaid boundary lines, not included in the public squares, house lots, outlots, streets and roads, are designated for commons; provided, always, that the hoard of trustees reserve the right of laying out such parts thereof as they from time to time may think proper, into house lots, outlots,” etc.
The important questions to be settled are — Had the board of trustees authority to make this reservation upon the plat ? — and have they now *110 the power to lay off lots, etc., and sell the same, as in their judgment the interests of the University and public convenience may require ?
First: As to the power to make this reservation.
In coming to a correct conclusion upon this question, it is of some importance to look well to the subject matter. The Legislature were intrusted with a fund for the purpose of advancing the cause of science. The main intent was to make a disposition of it in the best manner to advance the design of the donor. All of their acts should be favorably construed to effect this design. The Ohio University was the great object in view throughout. The town-of Athens was merely incident and subsidiary to that object. We are forced to this conclusion to avoid an inference of unfaithfulness in the discharge of the trust con-11©] tided to the state by the bounty of the United ^States. The resolution of 1799 speaks only of such spacious commons, lots, squares, etc., as would be of advantage to the University ; and all of the subsequent legislation must be construed with this, as a part of the whole. Hence, the intent of the power to alter the plan of Putnam and others, contained in the act of 1803, may be gathered. That, also, was for the advantage of the University. The act mentions the tract in question, as commons, or outlots, and the power is expressly given to the trustees (not then appointed) to extend the house lots into it, without restriction, as to them might seem proper. But it is thought the proviso is a limitation of this power. The object of the proviso must be looked to in determining this point. The plat was to be completed as far as necessary to advance the main object, and the designation of the uses of the commons was to be made, and the plat recorded, before sales, in order to prevent surprise upon purchasers, and to become evidence of the extent of their rights. The country was then new — a small area was then sufficient to accommodate a sparse population ; time, and an increase of inhabitants, might render a greater number of house lots matter of public convenience, as well as beneficial to the University. Its interests being regarded as the primary object, ea.n it be supposed that the Legislature, anxious faithfully to discharge the trust confided to the state, intended to force into market at once, and under the circumstances, all the lots that a great increase of population might ultimately render necessary. The supposition is not admissible. It better comports with honesty to suppose that they designed to vest a discretion, to be exercised by a board of trustworthy men, for the advancement of the main object, but so restricted that good faith must be observed as to others.
*111 This land, whether to he called commons or outlots, remained unsurveyed because it was not then needed. Its uses were so designated as to prevent deception. The uses were consistent with the primary object of the law; and we, therefore, say the reservation was legally made.
*As there is testimony in the case, taken for the purpose of [111 proving that the purchasers of lots adjacent to this land bid higher on account of its proximity to this common than they otherwise would, it is perhaps proper to notice it. All we have to say upon the subject is, that if they were misled and deceived, it was the consequence of their own folly or neglect. The law had been published — the plat was made and recorded. It was the business of purchasers to look to them for information. These would not have misled them. If they chose to trust to the idle declarations of men unauthorized to speak upon the subject, and who gave incorrect information, chancery will not aid them.
This seems to be nearly sufficient to dispose of this case ; for it is not readily perceived how the complainant’s bill can be sustained with this one point against them. However, as other points have been argued, and the counsel of respondents wish them determined, we pass to the question, whether the trustees have now the power to lay off and sell additional lots. If they have not, I put the question, when did they lose it? The eleventh section of the act of February 21, 1805, vests the townships 8 and 9 “ in the corporation, in trust, for the sole use, benefit and support of the University, forever.” And the thirteenth section clothes the trustees with power to “ proceed and sell, from time to time, at public auction, such of the house and outlots as they may think proper.” The fact that the cattle and sheep of people living in Athens have depastured the grass growing on this land no more defeats this right than it defeats the title of the owners of other adjacent land that has been treated in like manner.
But if at law it would defeat the title, we then say to the complainants, try the question at law ; for chancery will not take jurisdiction where the law affords a plain and adequate remedy.
Injunction dissolved, and bill dismissed.
Judge Read, being one of the Trustees of the Ohio University, did not sit in this ease.